# N. Y. SUPERIOR COURT.

EMIL JUSTH and ALEXANDER FRANK, plaintiffs and appellants, agt. THE NATIONAL BANK OF THE COMMONWEALTH, defendant and respondent.

Where a bank loans a certain sum of money to a firm of brokers on call upon collateral security, to be repaid the same day, and during the day such firm procures another loan from the plaintiffs of a certain sum upon collateral securities, which are subsequently ascertained to be *forgeries*, and the firm of brokers deposit the certified checks of the plaintiffs in their bank and take up their collateral securities, some of which prove to be forgeries, and the bank collects the plaintiffs' checks in the ordinary course of business, for which it gives the firm of brokers credit in the usual way, the bank is not liable to the plaintiffs for the amount of the loan they made to the firm of brokers on presenting the forged collateral securities taken by them and demanding of the bank the repayment of those checks.

The law will protect a purchaser of personal property, and especially of negotiable paper, who has acquired it for a fair and valuable consideration, in the usual course of trade, and without any notice of any conflicting claims or of suspicious circumstances calculated to awaken inquiry or to put him on his guard, although the property was in fact obtained by the vendor from the true owner fraudulently.

*General Term, June,* 1873.

*Before* FREEDMAN, CURTIS *and* VAN VORST, *JJ.*

APPEAL by plaintiffs from judgment dismissing the complaint.

JOHN E. BURRILL, *for appellants.*
JAMES EMOTT, *for respondent.*

*By the Court,* FREEDMAN, *J.*—This action was brought by the plaintiffs to recover the sum of $40,000, loaned by

them to William E. Gray & Co., and deposited by the latter with defendant, on the ground that the loan was made on the security of certain collaterals, which proved to be forged. On the trial the following facts were established.

William E. Gray & Co. kept an account with defendant, and, on the morning of December 10th, 1869, they commenced the business of the day by borrowing $30,000 from said bank. The loan was made in the ordinary manner of doing business with brokers, on call, upon collaterals and on condition that it should be repaid during the day. The collaterals consisted of three New York state bounty bonds of $10,000 each. During the day Gray & Co. made deposits and drew checks. Between twelve and two o'clock they paid by their check upon said bank $10,000 on account of the loan and took up one of the bonds.

At about 2.10 P. M., on the same day, plaintiffs' firm loaned Gray & Co. $30,000, and, about ten minutes thereafter, $10,000, upon the pledge of securities purporting to consist of New York state bounty bonds, United States 5-20 bonds, registered, and United States 5-20 coupons. Each of these loans was made in the form of a check, drawn by plaintiffs upon the National Bank of the State of New York, and certified by the latter to be good. The checks thus certified were separately deposited by Gray & Co. with the defendant in the usual way, and collected by said defendant.

At or shortly after three o'clock on the same day Gray & Co., by their check of $20,000 upon defendant's bank, repaid the balance of the loan obtained from said bank, and demanded the remaining two of their bonds. These were at this time in the hands of the cashier, who had gone out to make inquiries concerning them. The inquiry resulted in the discovery that the two bonds had originally been issued for $1,000 each, and had been altered to represent a value of $10,000 each. Upon such discovery Gray & Co. assented that the said bonds should be turned over for their account to the Manhattan Company, which acted as the tranfer

agents of the state; and the bonds were turned over by defendant accordingly.

William E. Gray, who had made the transaction with the plaintiffs, absconded on the 11th day of December, 1869. About a month thereafter plaintiffs ascertained that most of the securities, upon which they had made the two loans above referred to, were forgeries; and upon such discovery they immediately tendered· to the defendant the said securities, and demanded payment of the $40,000 collected by defendant on plaintiffs' checks, which demand was refused.

There was no evidence that the defendant had taken plaintiffs' moneys in bad faith, or with any notice of the fraud perpetrated by Gray & Co. upon the plaintiffs; and the proof was wholly insufficient to sustain the theory that the defendant delivered to Gray & Co. the same forged bonds that were received by plaintiffs as collaterals, with a view or for the purpose of enabling Gray & Co. to raise money from the plaintiffs on them to make good a deficiency in their account with the defendant. On the contrary, it appeared that plaintiffs' checks were received on deposit by defendant in the ordinary course of business, and that their respective amounts were credited to Gray & Co. in the usual way. There was no evidence that the first bond that was taken up and surrendered between twelve and two o'clock was not a perfectly valid instrument; nor was it shown that it ever went to the plaintiffs. It was shown that the other two bonds never went to plaintiffs at all.

Upon this state of facts it is difficult to see how the action can be maintained. Although the fundamental principle of our law of personal property is that no man can be divested of his property without his own consent, and that, consequently, even a *bona fide* purchaser from a person in the possession of property, who has *no title to it, and no authority whatever* from the owner to sell or dispose of it, cannot acquire any title against the true owner (*Williams* agt. *Merle*, 11 *Wend.*, 80; *Ely* agt. *Ehle*, 3 *Comst.*, 509; *Everett*

agt. *Saltus*, 15 *Wend.*, 474; *S. C. on error*, 20 *Wend.*, 69; *Wilson* agt. *Nason*, 4 *Bosw.*, 155; *Grand Trunk Railway Co.* agt. *Edwards*, 56 *Barb.*, 408; *Decker* agt. *Mathews*, 12 *N. Y.*, 313; *Boyce* agt. *Brockway*, 31 *id.*, 490). There are numerous exceptions to the general rule, which are founded on the obvious policy of human affairs. Thus, the law will, in many cases, imply an authority from the owner to sell; and, where the owner has conferred an apparent right of property upon the vendor, or an apparent right of disposal, where he has furnished the vendor with the external indicia of such right, and the vendor has sold the goods and delivered the possession thereof, the law will protect a purchaser who has acquired the property for a fair and valuable consideration, in the usual course of trade, and without any notice of any conflicting claim, or of suspicious circumstances calculated to awaken inquiry or to put him on his guard, although the goods were in fact obtained by the vendor from the true owner fraudulently. The same exception applies with still greater force to a case of negotiable paper. In the present case plaintiffs made their checks payable to the order of Gray & Co., and delivered them without restriction as to their use. They intended to part and did part not only with the possession of them, but also with their right of property in the money which the checks represented. Gray & Co., therefore, were not limited as to the manner of the use of the checks, and a subsequent *bona fide* holder for a valuable consideration could acquire a good title to them.

As has been pointed out in *Philbrick* agt. *Hallett* (43 *How.*, 419; *S. C.*, 12 *Abb. N. S.*, 419), the doctrine, as to what constitutes a person a *bona fide* holder of negotiable paper for value, varies with the facts peculiar to different classes of cases. In the case of commercial paper obtained by fraud, or fraudulently put in circulation, the rule, undoubtedly, is as claimed by plaintiffs, that the mere receipt of such paper as payment or security for a precedent debt, no new credit or other thing of legal value being given on the faith thereof,

and no security being relinquished or discharged, nor any new responsibility incurred on the credit thereof, is not parting with value, such as to enable the holder to enforce such paper against an accommodation party, or to hold it against the true owner, or to hold it free of equities existing upon it against the transferrer at the time of the transfer. But this rule is not broad enough, for several reasons, to enable plaintiffs to recover back their money. The defendant is no longer the holder of the checks. It received them as so much money, and immediately charged itself with the amount thereof, and credited Gray & Co.'s account accordingly. The relation of banker and depositor being that of debtor and creditor (*Ætna National Bank* agt. *Fourth National Bank*, 46 *N. Y.*, 82; *Oddie* agt. *National City Bank of New York*, 45 *id.*, 735; *Bank of the Republic* agt. *Millard*, 10 *Wallace*, 152), the defendant, on receipt of the certified checks, became the debtor of Gray & Co. for so much money, and the title to the deposit passed to the defendant. Gray & Co. made other deposits; and it was from the general balance, standing to the credit of Gray & Co., that defendant afterwards paid a check drawn by Gray & Co. to the order of Brown & Loveridge for $24,362.50, and the checks taken by the defendant in payment of the loan made to Gray & Co. in the morning. By these various transactions, and the surrender of Gray & Co.'s securities, the relations of all the parties were so changed that the defendant must be deemed to have acquired the usual right of a *bona fide* holder for value (*Market Bank* agt. *Hartshorne*, 3 *Keyes*, 137).

But even if the question were with the defendant as actual holder of the checks, neither the National Bank of the State of New York, on which they were drawn, and which had certified them, nor the plaintiffs could resist their payment or collection; for the defendant not only discharged upon its books the indebtedness of Gray & Co., but it also surrendered the bonds pledged as collateral security. The validity of one of these bonds has not been disproved; and the other two,

Justh agt. National Bank of the Commonwealth.

as the evidence shows, were still good for $1,000 each. This would constitute the defendant a *bona fide* holder for a valuable consideration within the rule above cited (*Bank of Salina* agt. *Babcock*, 21 *Wend.*, 497 ; *Bank of Sandusky* agt. *Sewille*, 24 *id.*, 115 ; *Mohawk Bank* agt. *Corey*, 1 *Hill*, 53 ; *White* agt. *Springfield Bank*, 3 *Sandf.*, 222 ; *N. Y. Marbled Iron Works* agt. *Smith*, 4 *Duer*, 362 ; *Youngs* agt. *Lee*, 12 *N. Y.*, 551 ; *Boyd* agt. *Cummings*, 17 *id.*, 101 ; *Brown* agt. *Leavitt*, 31 *id.*, 113 ; *Chrysler* agt. *Renois*, 43 *id.*, 209).

The rights of the parties having become fixed on the 10th day of December, 1869, the testimony offered by plaintiff as to the verbal statements made by certain officers of the defendant in January, 1870, was rightfully excluded on the ground of its immateriality (*Baptist Church* agt. *Brooklyn Fire Ins. Co.*, 28 *N. Y.*, 153).

The complaint was properly dismissed, and the judgment appealed from must be affirmed, with costs.

CURTIS and VAN VORST, JJ., concurred.